# UNITED STATES OF AMERICA
# MERIT SYSTEMS PROTECTION BOARD

MADELINE S. VAN WAGENEN,
          Appellant,

        v.

DEPARTMENT OF HOMELAND
    SECURITY,
          Agency.

DOCKET NUMBER
SF-0432-13-0193-I-1

DATE: February 11, 2015

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Alan L. Lescht, Esquire, and Susan L. Kruger, Esquire, Washington, D.C.,
    for the appellant.

Kimberly A. Jones, Esquire, Laguna Niguel, California, for the agency.

## BEFORE

Susan Tsui Grundmann, Chairman
Anne M. Wagner, Vice Chairman
Mark A. Robbins, Member

## FINAL ORDER

¶1      The appellant has filed a petition for review of the initial decision, which affirmed the agency's performance-based removal action. Generally, we grant petitions such as this one only when: the initial decision contains erroneous

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

findings of material fact; the initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case; the judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case; or new and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. *See* Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115). After fully considering the filings in this appeal, and based on the following points and authorities, we conclude that the petitioner has not established any basis under section 1201.115 for granting the petition for review. Therefore, we DENY the petition for review and AFFIRM the initial decision, which is now the Board's final decision. 5 C.F.R. § 1201.113(b).

¶2        The appellant was removed from the position of Asylum Officer, GS-0930-12, U.S. Citizenship and Immigration Services, Department of Homeland Security, in the Los Angeles Asylum Office (hereinafter "service center"), effective December 17, 2012. Initial Appeal File (IAF), Tab 1 at 1, 3, Tab 6, Subtab 4a. The appellant had over 22 years of federal service, 18 of which were in the position from which she was removed. *See* IAF, Tab 1 at 1, Tab 6, Subtab 4b at 1.

¶3        Asylum Officers adjudicate affirmative asylum claims, that is, humanitarian claims for permanent residence made by aliens who are in the country with or without legal status. Asylum seekers file claims directly with the agency. *See* IAF, Tab 28, Exhibit (Ex.) A at 9; *see also Department of Homeland Security, The Affirmative Asylum Process*, http://www.uscis.gov/humanitarian/refugees-asylum/asylum. The agency's affirmative asylum process is nonadversarial in that no government official argues against the application for asylum. IAF, Tab 28, Ex. A at 11. Generally, applications are granted, recommended for approval (pending receipt of additional information), denied, or referred to an

immigration judge at the U.S. Department of Justice (DOJ) for an adversarial proceeding. *Id.* at 13-16.

¶4      Asylum Officers work under tight deadlines imposed by statute. Once an application is forwarded to an agency service center, the case must be adjudicated within 180 days. IAF, Tab 29, Ex. 12 at 11-12; *see* 8 U.S.C. § 1158(d)(5)(A)(iii). The 180-day processing period is shared by the agency and DOJ's immigration judges. IAF, Tab 29, Ex. 12 at 11-12. The agency's service center must adjudicate cases within 60 days so that DOJ has 120 days to complete its adjudicatory process. *Id.* Thus, Asylum Officers must interview applicants within 45 days and provide assessments to their supervisors within 4 days of conducting interviews. *Id.* at 12; IAF, Tab 6, Subtab 4d at 7.

¶5      In addition to having a brief window for processing, asylum cases can be factually complex. *See* IAF, Tab 28, Ex. A at 39-63, Tab 35; *see also* Hearing Transcript (HT) at 124-25, 134-35. Processing the cases can be time-consuming if Asylum Officers thoroughly research the conditions of the countries from which applicants seek asylum, conduct probing interviews in which they test the applicants' stories, and prepare assessments referring cases to DOJ based on credibility issues. *See* IAF, Tab 28, Ex. A at 39-63; *see also* HT at 134-35.

¶6      The appellant argued that, starting in 2000, while she served as chief union steward, the performance standards for Asylum Officers were unreasonably high and did not allow sufficient time in which to thoroughly review applications. HT at 164. She raised this concern to her supervisors and managers over the years, as well as to Alejandro Mihorkas, the agency's Director, at a town hall meeting in February 2011, and to Senator Charles Grassley in September 2011. HT at 185-86; *see* IAF, Tab 28, Ex. T. In 2004 and 2005, the appellant complained that the wife of the Los Angeles service center director, G.M., was serving in his chain of command. The appellant's complaint resulted in the wife's reassignment. *See* IAF, Tab 28, Ex. V. The appellant also testified for a coworker in an equal employment opportunity (EEO) matter involving G.M. in

September 2010. IAF, Tab 28 at 18. She filed several formal EEO complaints over the years as well. *Id.*

¶7     On November 4, 2011, the appellant received an Employee Performance Plan and Appraisal Form (PPA) for fiscal year (FY) 2012. IAF, Tab 6, Subtab 4d. The PPA lists five critical core competencies, which include communication, customer service, representing the agency, teamwork and cooperation, and technical proficiency. *Id.* at 2-3. The PPA also lists six critical performance goals. *Id.* at 4-9. Performance goal 4, timely case completion, required the appellant to submit a written decision and any additional documentation to her supervisor, and to complete any necessary computer updates, within 4 working days after conducting an applicant interview. *Id.* at 7. To achieve performance expectations, the appellant could not miss the 4-day deadline more than an average of 4.5 times per pay period. *Id.* at 8.

¶8     After the agency found that the appellant's performance was unacceptable for performance goal 4 and for core competencies 2 through 4 (customer service, representing the agency, and teamwork and cooperation), she was placed on a 90-day performance improvement plan (PIP) commencing March 26, 2012. IAF, Tab 6, Subtab 4p. To meet the PIP standard for performance goal 4, the appellant could fail to timely submit cases no more than an average of 4.5 times per pay period. *Id.* at 2. Regarding core competencies 2 through 4, the PIP letter stated that the appellant would achieve expectations:

> when [she] demonstrated by June 29, 2012 that no applicant is sent home without a decision when they appear for decision pick-up due to [her] delay in submitting the case. This standard is also met when no applicant is notified that their decision will not be ready for pickup due to [her] failure to submit the case timely. Additionally, this standard is met when no applicants are sent home without an interview and no cases are reassigned on the date of interview due to unreasonable delays caused by [the appellant].

*Id.* at 3. The PIP letter also encouraged the appellant to request any training that might assist her and specifically suggested relevant training areas, including those

that would teach her how to conduct more efficient interviews, write assessments, manage her time, and organize her work. *Id.* at 4. In addition, she was instructed to clear and rearrange her workspace and develop a new method to systematize her files. *Id.* Her supervisor, S.U., testified that the appellant's office was cluttered and disorganized and that she arranged her work materials without considering the internal 4-day deadline for submitting cases for review. HT at 34-35.

¶9     S.U. was detailed to another location from March 26, to May 11, 2012. HT at 38. Between March 15, 2012, and April 27, 2012, the appellant was supervised by another team's supervisor, K.H. HT at 99. K.H. testified that she met with the appellant at least weekly to discuss her cases and she offered guidance regarding how to make concise credibility assessments. HT at 104-06. K.H. also removed 150 files from the appellant's office and instructed her to work only on newly-assigned cases so that she would not have a backlog while trying to perform successfully during the PIP. *See* HT at 105; *see also* IAF, Tab 6, Subtab 4j at 3, 15-17.

¶10    Starting in March 2012, all Asylum Officers at the service center received training regarding "credibility flaws" from P.H., a quality assurance trainer. IAF, Tab 6, Subtab 4j at 4-12, 14, 18-20, 22-23. The appellant spoke with P.H. following the training session regarding issues he had discussed and expressed her disagreement with some of the course content. *Id.* at 7-8, 10. P.H. responded that he believed the appellant's interpretations regarding credibility were inconsistent with the agency's headquarters' credibility lesson plans, and he instructed her to follow headquarters' guidance. *Id.* at 7-8. K.H. also advised the appellant that, even if she did not agree with the instructions given during training, the guidance had been vetted by headquarters and she needed to follow it. HT at 106-07.

¶11    Between March 15, and April 27, 2012, the appellant submitted ten assessments, only one of which was timely. IAF, Tab 6, Subtab 4n at 4-5; HT

at 103. K.H. testified that she corrected and added content to the assessments without returning them to the appellant because they were already past due. HT at 102-03. Of the ten assessments, two were a single page in length because the applicant had not testified, and only four of the assessments addressed the full merits of the application. HT at 103-04. Nevertheless, K.H. noted, the appellant's written products were generally too long. HT at 110.

¶12    On June 28, 2012, S.U. extended the PIP period to August 10, 2012, because he had been absent for much of the period. He noted, however, that the appellant's performance was not yet acceptable. *See* IAF, Tab 6, Subtab 4o; *see also* HT at 36-38. During the remaining PIP period, he observed the appellant as she conducted three interviews and gave her written and oral feedback regarding her efficiency and the quality of her work. HT at 48-49. He advised her to adopt a "template approach" when she prepared written assessments, providing samples from a highly-productive Asylum Officer at the service center. HT at 51-52. He also had the appellant observe another Asylum Officer as she interviewed an applicant. HT at 48-50.

¶13    On August 10, 2012, S.U. informed the appellant that she had failed the PIP. IAF, Tab 6, Subtab 4g. He rated her performance as unacceptable for core competencies 2, 3, and 4, and for performance goal 4, yielding an overall rating of unacceptable for FY 2012. *Id.*, Subtab 4d. The agency proposed the appellant's removal. *Id.*, Subtab 4f. The notice of proposed removal stated that she had averaged seven untimely cases per pay period and submitted timely assessments for only three of the 77 interviews that she conducted during the PIP period. *Id.* at 5. The appellant failed to submit assessments for 27 of the 77 interviews. *Id.* Regarding her performance in the core competencies, six applicants whom she interviewed were sent home without a decision when they appeared for pick-up, and she notified 16 applicants that their decisions would not be ready for pick-up when originally promised. *Id.* at 3-4. The appellant was

subsequently removed, and she filed this Board appeal. *Id.*, Subtab 4a; IAF, Tab 1.

¶14     On appeal, the appellant asserted that the agency discriminated against her based on age[2] and disability (on grounds of both disparate treatment and failure to accommodate). IAF, Tab 1 at 8-11. She also claimed reprisal for union and EEO activity and retaliation for making protected disclosures as a whistleblower. *Id.* at 3-5, 8-11; IAF, Tab 9. The administrative judge found that the agency proved by substantial evidence that its performance standards were valid, realistic, and attainable; the appellant failed to raise her performance to an acceptable level overall during the PIP; and the agency gave her a reasonable opportunity to improve.[3] IAF, Tab 41, Initial Decision (ID) at 11-18. She also found that the appellant did not show by preponderant evidence that the agency had discriminated against her based on disability. ID at 18-22. She found, moreover, that the appellant did not show that her removal was in retaliation for protected whistleblowing activity, ID at 22-28, and she did not establish that the

---

[2] Although the appellant initially listed age discrimination as one of her affirmative defense claims, *see* IAF, Tab 1 at 9-10, her response to the administrative judge's order regarding affirmative defenses, *see* IAF, Tab 8, did not address age discrimination, *see* IAF, Tab 9. The administrative judge deemed the claim to have been withdrawn. *See* IAF, Tab 30 at 2-3.

[3] An agency may remove an employee for unacceptable performance under 5 U.S.C. § 4303 on proving by substantial evidence that: (1) the agency had performance standards that were approved by the Office of Personnel Management; (2) the appellant's performance fails to meet the established performance standards in one or more critical elements of her position; (3) the agency established performance standards and critical elements and communicated them to the appellant at the beginning of the performance appraisal period; (4) the agency warned the appellant of the inadequacies of her performance during the appraisal period and gave her an adequate opportunity to improve; and (5) after an adequate PIP, the appellant's performance remained unacceptable in at least one critical element. *See Muff v. Department of Commerce*, 117 M.S.P.R. 291, ¶ 5 (2012)). Substantial evidence is that degree of relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree. 5 C.F.R. § 1201.56(c)(1).

agency acted in retaliation for protected union or EEO activity, ID at 28-30. The administrative judge thus affirmed her removal. ID at 31.

The appellant's newly submitted evidence would not change the administrative judge's conclusion that the performance standards were valid.

¶15 On review, the appellant has submitted several items that she argues show that the agency's performance standards were invalid, including a copy of the agency's newly-adopted PPA for Asylum Officers, which has been in use since December 18, 2013. Petition for Review (PFR) File, Tab 3 at 32-68. She argues that the agency changed the performance standards for Asylum Officers approximately 9 months after she was removed and that this change was under consideration while she was on the PIP. *Id.* at 6-8. She points out that Asylum Officers had complained for several years that performance goal 4 made it difficult to render a thorough assessment of every asylum application. *Id.* at 6-8, 9-17. She cites a 2008 Government Accountability Office report stating that the 1999 performance standards were adopted without any empirical evidence. *Id.* at 5-6. In response to that report, she explains, the agency commissioned a study of the asylum process, which concluded that each Asylum Officer's case load should be reduced by half. *Id.* at 6. The appellant argues that, although the changes to the performance standards were still under review during her PIP, the agency had already committed to adopting more realistic standards prior to her removal. *Id.* at 7. The new standards do not contain performance goal 4 or any other timeliness standard. Under the new standards, she explains, National Security/Fraud Detection is the highest-rated performance goal, worth 40 percent of the overall rating, and there is no performance goal for timeliness. *Id.* at 8; *see id.* at 35-36. The focus on quality, she asserts, shows that the standards under which she was removed were invalid. *Id.* at 9-10. She contends that the administrative judge thus erroneously concluded that the performance standards under which she was removed were valid because other Asylum Officers had been able to meet the standards. *Id.* at 10-11; *see* ID at 16.

¶16      Under 5 C.F.R. § 1201.115, the Board will not consider evidence submitted for the first time with the petition for review absent a showing that it was unavailable before the record was closed despite the party's due diligence. *Avansino v. U.S. Postal Service*, 3 M.S.P.R. 211, 214 (1980). The appellant included five exhibits with her petition for review. PFR File, Tab 3 at 31-68. Four of the five exhibits indisputably post-date the close of the record and would meet the Board's definition of new evidence but only to the extent that they include information not already in the record.[4] *See Meier v. Department of the Interior*, 3 M.S.P.R. 247, 256 (1980) (evidence that is already a part of the record is not new). Exhibits 2, 3, and 5 pertain to fraudulent applications for asylum. The appellant put forward considerable evidence on fraud during the hearing, even adducing the testimony of the agency's Fraud Detection and National Security Immigration Officer. *See* HT at 220-26.

¶17      Moreover, none of the appellant's submissions pertaining to fraud meet the Board's definition of materiality.[5] A party that seeks to submit new evidence on review must also show that the evidence is material, that is, it is of sufficient weight to warrant an outcome different from that of the initial decision. *See Russo v. Veterans Administration*, 3 M.S.P.R. 345, 349 (1980). The agency has

---

[4] The hearing ended on June 11, 2013. *See* IAF, volumes 8-9. The administrative judge admitted a final exhibit on June 13, 2013, *see* IAF, Tab 35, though the appellant later sought to have other items added to the record, *see* IAF, Tabs 36-39. The administrative judge also admitted for consideration other exhibits on August 16, 2013, and October 17, 2013. Exhibit 1, a copy of the PPA implementing the new standards, is dated December 18, 2013. PFR File, Tab 3 at 32. Exhibits 2, 3, and 5, which pertain to fraud in the affirmative asylum process, are dated February 11, 2014. *Id.* at 43, 46, 66. Exhibit 4, which also pertains to asylum fraud, is dated July 17, 2013. *Id.* at 55.

[5] On November 12, 2014, the appellant's representative filed a "Motion for Leave to File Supplemental Brief and Exhibits in Support of Petition for Review." PFR File, Tab 9. We DENY the appellant's motion. The appellant's motion appears to relate to the appellant's claims below regarding fraud, specifically her claim that other Asylum Officers only successfully performed because they allowed applicants to commit fraud. As noted herein, the appellant's prior submissions regarding fraud failed to meet the Board's definition of materiality and thus we DENY the appellant's motion to submit further similar documentation.

never denied that the fraud detection is an important concern, but this appeal pertains only to the appellant's performance deficiencies, which the agency proved by substantial evidence. Shifting the focus to more general concerns would not change the outcome of the appeal.

¶18     As for Exhibit 1, the PPA in use since December 18, 2013, and the issue of whether the adoption of new performance standards proves that the standards under which the appellant was evaluated were invalid, the administrative judge considered this issue as well. The appellant adduced significant evidence regarding the timely processing of cases, and the administrative judge knew that the standards had been criticized and were under revision. *See, e.g.*, IAF, Tabs 28, 35, 36, 39.

¶19     Performance standards must, to the maximum extent feasible, permit the accurate appraisal of performance based on objective criteria. *See* 5 U.S.C. § 4302(b)(1); *see also Guillebeau v. Department of the Navy*, 362 F.3d 1329, 1335-36 (Fed. Cir. 2004). They must be reasonable, realistic, attainable, and clearly stated in writing. *Thomas v. Department of Defense*, 95 M.S.P.R. 123, ¶ 12 (2003), *aff'd*, 117 F. App'x 722 (Fed. Cir. 2004). The replacement of standards is not in itself evidence of their invalidity nor is the fact that similarly-situated employees testified that the standards were unrealistic. *See Benton v. Department of Labor*, 25 M.S.P.R. 430, 434-35 (1984); *see also* IAF, Tab 6, Subtab 4b at 8-26, Tab 28, Ex. E at 6-7, Tab 35; HT at 124-28.

¶20     The appellant asserts that the emphasis on quality is something to which she had long been attuned. PFR File, Tab 3 at 7-8. She argues that she granted less than one percent of the applications she approved because she was so concerned about fraud and that testimony from her supervisor and others shows that her inability to meet performance standards was attributable to the thoroughness of her interviews and research. *Id.* at 10-12; *see* HT at 67-68, 135; *see also* HT at 222. The performance standards under which she was evaluated, she asserts, may have been proper for others, but they did not permit an adequate assessment

of *her* job performance.  PFR File, Tab 3 at 10-11; *see Williams v. Department of the Treasury*, [35 M.S.P.R. 432](), 435 n.6 (1987) (finding that the fact that all employees were evaluated under the same standard, and that other employees in the unit were able to meet that standard, does not establish that the standard permitted the accurate evaluation of job performance).

¶21        We reject the notion that the standards were invalid.  The case upon which the appellant relies, *Williams*, is distinguishable because in that case the Board found that the methodology for measuring productivity was defective because it failed to capture significant nonquantifiable duties that were assigned to employees.  *See Williams*, 35 M.S.P.R. at 434-37; *see also* PFR File, Tab 3 at 10-11.  The appellant does not argue that the agency's methodology for measuring timeliness is invalid; instead, she asserts that the standard should not apply in her case.  The appellant also fails to account for the flexibility inherent in the standard to accommodate the more difficult cases.  Although performance goal 4 required Asylum Officers to submit completed cases to their supervisors within 4 working days after applicant interviews, they were allowed to submit cases after the deadline up to 4.5 times per pay period, that is, for 25 percent of the maximum number of interviews assigned to an officer during a pay period.[6]  IAF, Tab 6, Subtab 4d at 6-8; *see* HT at 132-33, 157.  Moreover, as the appellant's supervisor testified, she would have had additional time to pursue suspected fraud while her assessments were under review after the 4-day deadline passed.  HT at 32-33.  The appellant essentially contends that the agency's standards were invalid because they did not allow her to process cases as *she* wanted to process them.  Although her concerns about fraud seem well-placed, she was nevertheless obligated to perform her job according to the performance standards in force at the time.

---

[6] Asylum Officers were assigned a maximum of 18 interviews per pay period.  *See* IAF, Tab 6, Subtab 4d at 6; *see also* HT at 132-33, 157.

¶22    The appellant additionally asserts that the agency official who testified that most Asylum Officers met the standard failed to substantiate whether all officers whose performance was deemed acceptable or better were rated based on accurate statistics. PFR File, Tab 3 at 10; *see* IAF, Tab 29 at 6; *see also* HT at 13-16. She cites the testimony of C.W., a former Asylum Officer who averred that she never received an unacceptable rating even though she knew she did not meet the timeliness standard. *See* HT at 126. Even if the agency's ratings are unsubstantiated, however, the appellant's claims are equally so, as the former Asylum Officer offered no concrete evidence to support her claim that she had failed to meet performance goal 4.

¶23    Finally, we note that the appellant was removed for unacceptable ratings on three additional performance standards, the core competencies related to customer service, representing the agency, and teamwork and cooperation. IAF, Tab 6, Subtab 4f at 1. Those standards are still in place. *Compare* IAF, Tab 6, Subtab 4d at 2-3, *with* PFR File, Tab 3 at 33. For all of these reasons, the appellant's arguments related to the validity of the performance standards are thus unavailing.

The appellant was given adequate opportunity to improve her performance.

¶24    The appellant argues that the administrative judge erred when she concluded that the agency gave her sufficient opportunity to improve her performance. PFR File, Tab 3 at 17-23. She asserts that she was supervised by three different supervisors during the PIP period, none of whom offered adequate guidance or training regarding how to improve on timeliness without compromising quality. *Id.* at 17-20. Again, her argument essentially rests on the premise that she could not follow her own priorities if she followed those of the agency. Although she reported to three different supervisors (one only briefly) during the PIP, the period was extended to cover the time that her primary supervisor was unavailable. *See* IAF, Tab 6, Subtab 4o. The record also shows

that she received formal instruction regarding credibility assessments and interviewing techniques, though she took issue with much of what the trainer said. *See id.*, Subtab 4j at 4-12, 14, 18-20, 22-23; *see also* HT at 106-07.

¶25    The appellant contends that the agency failed to adjust the timeliness standard to account for her preparation time for interviews that applicants canceled during the PIP. PFR File, Tab 3 at 20-21. Her supervisor testified, however, that the agency considered preparation time when evaluating her overall productivity, but the cancelled interviews did not affect her evaluation under performance goal 4 because no assessments would have been due for interviews that had not been conducted. HT at 75, 80-81.

¶26    The appellant also contends that the PIP requirements were so rigid that she did not have a reasonable chance of meeting them. PFR File, Tab 3 at 21-22. She argues that the PIP required her to submit timely assessments for *every* interview she conducted, whereas other similarly-situated Asylum Officers did not work under the same standard. *Id.* at 21. She additionally argues that the agency should have afforded her a reasonable period of time during which to attain the required level of timeliness and considered that she was using a significant amount of leave for medical reasons. *Id.* at 21-22. The appellant's PIP, however, allowed 4.5 untimely submissions per pay period, and thus was no more stringent than the standard under which she had worked for years. *Compare* IAF, Tab 6, Subtab 4p at 2-3, *with id.*, Subtab 4d at 2-3. As for leave granted to accommodate her medical condition, the agency was not obligated to excuse her from meeting the performance standards for her position. *See Henry v. Department of Veterans Affairs*, 100 M.S.P.R. 124, ¶ 10 (2005) (an agency is not obligated to restructure a position if doing so would entail the removal of the essential functions of the position). For all of these reasons, the appellant's argument, that the agency did not give her an adequate opportunity to improve, is unavailing.

<u>The appellant failed to preserve her objections to the inclusion of certain testimony.</u>

¶27     The appellant asserts that the administrative judge should have excluded agency testimony regarding the quality of her credibility assessments because such testimony was irrelevant to the reasons for which she was removed.  PFR File, Tab 3 at 22-23.  The appellant, however, did not object at the hearing to the testimony of H.G., the agency manager who supervised her after the PIP ended, or to the testimony of her other PIP supervisors.  She cannot do so now.  *See Hill v. Department of Health & Human Services*, 28 M.S.P.R. 91, 92-93 (1985), (an employee's failure to object at hearing to introduction of allegedly irrelevant evidence precluded her from doing so on review), *aff'd*, 795 F.2d 1011 (Fed. Cir. 1986) (Table).

<u>The appellant failed to establish her affirmative defenses by preponderant evidence.</u>

¶28     The appellant's remaining arguments pertain to her affirmative defenses, for which she bore the burden of proving by preponderant evidence.  *See* 5 C.F.R. § 1201.56(a)(2)(iii).  She argues that the administrative judge improperly found that the agency did not discriminate against her based on disability when she concluded that the medical evidence she offered in support of her request for a compressed work schedule did not establish her need for such an accommodation.  PFR File, Tab 3 at 24-25; *see* ID at 18-22.  She also asserts that the agency refused to extend to her a reasonable accommodation because of her performance issues and not for inadequate medical documentation.  PFR File, Tab 3 at 24; *see* IAF, Tab 28, Ex. Q.  She argues that the agency discriminated against her because management knew that she would never be able to improve her performance on timeliness because she focused her efforts on credibility determinations.  PFR File, Tab 3 at 24-25.

¶29     An employee is entitled to a reasonable accommodation but not necessarily the specific accommodation she chooses.  *See Miller v. Department of the Army*, 121 M.S.P.R. 189, ¶ 15 (2014).  Although the agency denied the

appellant's request to continue working four 10-hour days per week because she had performance problems while working that schedule, IAF, Tab 28, Ex. Q, it still allowed her flexible beginning and ending times and granted her leave requests, *see id.* at 2; *see also* IAF, Tab 29, Exs. 8, 10.

¶30    The appellant also argues that the agency failed to meet its burden to show by clear and convincing evidence that it would have removed her in the absence of her whistleblowing activities.[7]    PFR File, Tab 3 at 25-28.   In determining whether the agency met its evidentiary burden, the Board considers:  the strength of the agency's evidence in support of its personnel action; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.  *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999).   The administrative judge found that the agency presented no evidence regarding nonwhistleblower employees who were placed on a PIP or failed to achieve acceptable ratings but were not removed.   However, she found that the agency presented adequate evidence regarding the first and second *Carr* factors. ID at 26-28.

¶31    The appellant argues that the Board should reject the administrative judge's findings regarding the first *Carr* factor—the strength of the agency's evidence in support of its personnel action—because the agency failed to meet its burden of proof on the merits of the removal action.  PFR File, Tab 3 at 26.   These issues are addressed above where we found that the agency's removal action was proper.

---

[7] The administrative judge found that the appellant had made protected disclosures of actions that she reasonably believed evidenced a violation of a law, rule, or regulation, namely, the fact that G.M.'s wife was serving in his chain of command.  ID at 24-25. She likewise found that the appellant made protected disclosures regarding the rushed conditions under which Asylum Officers were required to work.   ID at 24.   She additionally found that the appellant's protected disclosures were a contributing factor in her removal.  ID at 25.

She also argues that the administrative judge erred in her analysis of the second *Carr* factor, the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the removal decision. *Id.* at 26-27. The administrative judge found that the proposing and deciding officials, D.R. and T.K., had motive to retaliate against the appellant because her protected disclosures generally implicated their conduct and decisions.[8] She also found that these officials did not seem to be influenced by the agency official with the strongest motive to retaliate, G.M. ID at 26-27. The record showed that D.R. declined to place the appellant on a PIP after she received an unacceptable rating for FY 2011 because the agency's performance plan had undergone significant changes prior to that year. HT at 89. Additionally, D.R. willingly replaced G.M., who was initially named deciding official, after the appellant requested that another manager serve in that position. *See* IAF, Tab 6, Subtab 4c at 2, 4, Subtab 4f; *see also* HT at 227-28. In any event, as the administrative judge noted, the agency's evidence regarding her performance difficulties is overwhelming, and any evidence that might suggest retaliation is weak by comparison. *See* ID at 28.

¶32     Finally, the appellant argues that administrative judge improperly found that the agency did not retaliate against her for union and EEO activities. PFR File, Tab 3 at 28-29. The administrative judge concluded that the appellant provided no evidence substantiating her assertion that the agency treated employees who did not engage in protected activities more favorably than she was treated. ID at 30. On review, the appellant points to the testimony of C.W.,

---

[8] Comments that are highly critical of agency management may reflect poorly on all agency managers. *See Phillips v. Department of Transportation*, 113 M.S.P.R. 73, ¶ 23 (2010). Thus, the fact that an agency official is outside of the whistleblower's chain of command, not directly involved in alleged retaliatory actions, and not personally named in the whistleblower's disclosure does not eliminate the possibility that such individual may harbor a retaliatory motive or exert a retaliatory influence on the whistleblower's treatment. *See Whitmore v. Department of Labor*, 680 F.3d 1353, 1371 (Fed. Cir. 2012).

a former Asylum Officer who did not engage in union or EEO activities.  PFR File, Tab 3 at 28.  C.W. testified that she failed to meet the timeliness standard, but was never rated unsatisfactory.  HT at 126.  The appellant also identified other Asylum Officers who did not engage in union or EEO activities and who, she asserted, either maintained comparable case backlogs or required medical accommodations, but were not placed on PIPs.  PFR File, Tab 3 at 28-29; *see* IAF, Tab 28, Ex. N; *see also* IAF, Tab 6, Subtab 4b at 8-12.

¶33    Where, as here, the parties have presented their evidence regarding the retaliation issues, the ultimate question is whether the appellant has shown by preponderant evidence that the agency's proffered reason for taking action against her was not the actual reason for the action and that the agency intentionally retaliated against her.  *See Marshall v. Department of Veterans Affairs*, 111 M.S.P.R. 5, ¶¶ 16-17 (2008).  The evidence considered at this stage may include:  (1) the elements of the prima facie case;[9] (2) any evidence the appellant presents to attack the agency's proffered explanations for its actions; and (3) any further evidence of retaliation that may be available to the appellant, such as independent evidence of discriminatory statements or attitudes on the part of the agency, or any contrary evidence that may be available to the agency, such as a strong track record in equal opportunity employment.  *Id.*, ¶ 17.  The Board may consider circumstantial evidence in determining whether an appellant has met her burden; however, to establish retaliation using circumstantial evidence, the appellant must show that the accused official knew of the protected activity, and provide evidence showing a "convincing mosaic" of retaliation against her.  *Id.*, ¶ 18.

---

[9] To establish a prima facie case of retaliation, an appellant must show that:  (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by the agency; and (3) a causal connection existed between the two.  *Marshall*, 111 M.S.P.R. 5, ¶ 14.  The elements for proving a prima case of retaliation for union activity are the same.  *Id.*, ¶ 15.  *Marshall* addresses within the same analytical framework both forms of retaliation alleged here.  *See id.*, ¶¶ 16-26.

¶34       Although the appellant documented a history of union and EEO activity and other disagreements wherein G.M. expressed strong anti-union sentiment, she put forward no evidence to suggest that S.U., D.R, or T.K. showed anti-union animus. *See* IAF, Tab 9 at 8.  She likewise did not provide any significant and persuasive evidence that employees without union or EEO activity were treated more favorably than she was treated, that the agency's stated reasons for taking the removal action were pretextual, or that any agency official made statements that would call into question the agency's stated reasons for her removal or reveal retaliatory animus against her.  Accordingly, her arguments regarding discrimination and retaliation are unavailing.

## NOTICE TO THE APPELLANT REGARDING
## YOUR FURTHER REVIEW RIGHTS

You have the right to request further review of this final decision.  There are several options for further review set forth in the paragraphs below.  You may choose only one of these options, and once you elect to pursue one of the avenues of review set forth below, you may be precluded from pursuing any other avenue of review.

Discrimination Claims:  Administrative Review

You may request review of this final decision on your discrimination claims by the Equal Employment Opportunity Commission (EEOC).  *See* Title 5 of the United States Code, section 7702(b)(1) (5 U.S.C. § 7702(b)(1)).  If you submit your request by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations<br>
Equal Employment Opportunity Commission<br>
P.O. Box 77960<br>
Washington, D.C. 20013

If you submit your request via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, NE
Suite 5SW12G
Washington, D.C. 20507

You should send your request to EEOC no later than 30 calendar days after your receipt of this order. If you have a representative in this case, and your representative receives this order before you do, then you must file with EEOC no later than 30 calendar days after receipt by your representative.  If you choose to file, be very careful to file on time.

Discrimination and Other Claims:  Judicial Action

If you do not request EEOC to review this final decision on your discrimination claims, you may file a civil action against the agency on both your discrimination claims and your other claims in an appropriate United States district court.  *See* 5 U.S.C. § 7703(b)(2).  You must file your civil action with the district court no later than 30 calendar days after your receipt of this order.  If you have a representative in this case, and your representative receives this order before you do, then you must file with the district court no later than 30 calendar days after receipt by your representative.  If you choose to file, be very careful to file on time.  If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security.  42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Other Claims:  Judicial Review

If you want to request review of the Board's decision concerning your claims of prohibited personnel practices described in 5 U.S.C. § 2302(b)(8), (b)(9)(A)(i), (b)(9)(B), (b)(9)(C), or (b)(9)(D), but you do not want to challenge the Board's disposition of any other claims of prohibited personnel practices, you

may request the United States Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction to review this final decision. The court of appeals must receive your petition for review within 60 days after the date of this order. *See* 5 U.S.C. § 7703(b)(1)(B) (as rev. eff. Dec. 27, 2012). If you choose to file, be very careful to file on time.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703) (as rev. eff. Dec. 27, 2012). You may read this law as well as other sections of the United States Code, at our website, http://www.mspb.gov/appeals/uscode/htm. Additional information about the United States Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11. Additional information about other courts of appeals can be found at their respective websites, which can be accessed through http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

If you are interested in securing pro bono representation for an appeal to the United States Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for a list of attorneys who have expressed interest in providing pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Merit Systems

Protection Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.


FOR THE BOARD: _____
William D. Spencer
Clerk of the Board

Washington, D.C.